**ZAZZALI, FAGELLA, NOWAK,
KLEINBAUM & FRIEDMAN**
By: Robert A. Fagella, Esq. (No. 018771977)
570 Broad Street, Suite 1402
Newark, New Jersey 07102
Tel.: (973) 623-1822
Fax: (973) 623-2209
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
#### Camden Vicinage

| | |
|---|---|
| BARBARA FRANCESKI,<br>975 Powhatan St.<br>Alexandria, VA 22314,<br><br>Individually and on behalf of all<br>others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FREEDOM MORTGAGE<br>CORPORATION,<br>A New Jersey Corporation,<br>907 Pleasant Valley Ave.<br>STE 3<br>Mt. Laurel, NJ 08054<br><br>and<br><br>NYCB Mortgage Company, LLC,<br>615 Merrick Ave.<br>Westbury, NY 11590<br><br>Defendants. | Civil Action No. 18-13945<br><br>COMPLAINT AND DEMAND<br>FOR JURY TRIAL |

## COMPLAINT

COMES NOW Plaintiff, Barbara Franceski, by and through undersigned counsel, and files this Complaint against Defendants Freedom Mortgage Corporation and NYCB Mortgage Company, LLC, and in support thereof states as follows:

### JURISDICTION AND VENUE

1.     The United States District Court for the District of New Jersey has jurisdiction of the federal claims herein under 28 U.S.C. § 1331. This Court has jurisdiction of the included state claims under 28 U.S.C. § 1367(a).

2.     Venue is proper in this District under 28 U.S.C. § 1391(b)(3), and (c).

### THE PARTIES

3.     Plaintiff, Barbara Franceski, is and was at all material times, a resident of the Commonwealth of Virginia, residing at 975 Powhatan St., Alexandria VA 22314.

4.     Defendant Freedom Mortgage Corporation ("Freedom Mortgage" or "Freedom") is the current owner and servicer of the loan secured by the real property located at 975 Powhatan St., Alexandria VA 22314. Freedom Mortgage has a principal place of business in Mt. Laurel, New Jersey and is incorporated in New Jersey.

5.     Defendant NYCB Mortgage Company, LLC ("NYCB") was the prior mortgage lender and servicer of the loan secured by the aforementioned real property. NYCB has a principal place of business in Westbury, New York and is a Delaware limited liability company present in the State of New Jersey.

2

226764

## FACTUAL ALLEGATIONS

6.      Barbara Franceski owns the single-family, residential property at 975 Powhatan St., Alexandria VA 22314, and has owned and resided in said property at all relevant times during the events surrounding this claim.

7.      Prior to October 31, 2017, NYCB was the lender and servicer of the mortgage loan secured by the aforementioned real property, a loan secured primarily for consumer purposes as Franceski's primary residence. A note and a security instrument describe the terms of the mortgage and they are attached hereto as Exhibits A and B respectively.

8.      The note required monthly payments on the mortgage loan, and the accompanying security instrument stated additional terms requiring payment to an escrow account for the purpose of assuring payment of all Alexandria City property taxes.

9.      At all relevant times up to and including the present, Franceski made all required payments, never missing a payment and never making a late payment.

10.     The City of Alexandria requires a two-installment payment of annual property taxes to be made as follows:  the first installment payment must be paid by June 15th and the second installment must be paid by November 15th.

11.     NYCB made the first installment payment for 2017 but did not make the second installment payment due on November 15, 2017.

12.     NYCB transferred the mortgage, including the servicing of the loan, to Freedom Mortgage, effective on October 31, 2017.

13.     NYCB sent Franceski a letter dated October 9, 2017, stating that "[t]he servicing of your mortgage is being transferred, effective October 31, 2017," that Freedom Mortgage would be the new servicer as of November 1, 2017, and that she was to "[s]end all payments due

226764

on or after November 1, 2017 to FREEDOM MORTGAGE." A copy of this letter is attached hereto as Exhibit C.

14.     Freedom also sent Franceski a letter, dated November 8, 2017, advising her to make future payments to Freedom Mortgage and stating, "The servicing of your mortgage loan from NEW YORK COMMUNITY BANK has transferred to us, effective 11/01/17." A copy of this letter is attached hereto as Exhibit D.

15.     As directed, Franceski made a November mortgage payment to Freedom.

16.     Freedom Mortgage failed to make the second installment payment of the 2017 Alexandria City property tax by the November 15th due date. The 2017 Form 1098 that Franceski received from Freedom shows that Freedom made no disbursements at all from the escrow account in 2017.

17.     The escrow account held more than enough funds to pay the second installment of the 2017 property tax by the November 15th due date.

18.     The City of Alexandria assessed Franceski penalties for late payment. Also, because the property tax was not paid in the 2017 calendar year, Franceski could not itemize the unpaid property tax on her federal Schedule A, and as a result, she incurred significant additional federal and state income tax liability for the 2017 tax year. *See* Internal Revenue Service, 2017 Instructions for Schedule A (Form 1040) A-7 (2017) ("If your mortgage payments include your real estate taxes, you can deduct only the amount the mortgage company actually paid to the taxing authority in 2017."). Virginia conforms to the federal tax code for itemized deductions in 2017. *See* Va. Dep't of Taxation, 2017 Form 760: Resident Individual Income Tax Booklet 11 (2017).

226764

19.     The lost benefit of itemizing the 2017 property tax will not be recoverable in the 2018 tax year due to the recent changes in the tax code barring the itemized deduction of state income and property taxes exceeding $10,000. *See* Tax Cuts and Jobs Act, Pub. L. No. 115-97, sec. 11042(a), § 164(b)(6)(B), 131 Stat. 2054, 2086 (to be codified at 26 U.S.C. § 164(b)(6)(B)).

20.     In 2018, after realizing the property tax was unpaid, Franceski attempted to coordinate with her new servicer, Freedom, to pay the property tax out of her escrow account.

21.     Freedom directed her to NYCB, who, in turn, claimed that Freedom was now the servicer and should make the payment.

22.     On or about March 26, 2018, the City of Alexandria finally received a tax payment and a penalty payment from Freedom Mortgage.

23.     As of now, neither NYCB nor Freedom have compensated Franceski for the tax liability in excess of the amount she otherwise would have paid had either NYCB or Freedom paid the property tax in 2017.

24.     In June 2017, Freedom issued a press release announcing its acquisition of residential mortgage assets from NYCB. The release stated that the purchase brought Freedom approximately $500 million of residential mortgage assets from NYCB and the "deal includes the right to service over $20 billion of residential mortgage loans."

25.     A Virginia FOIA request to the City of Alexandria, answered by city law clerk Harold Washington on June 21, 2018, returned the names and addresses of thirteen other homeowners (fourteen total homeowners including Franceski) in the City of Alexandria alone for whom NYCB and Freedom failed to make timely payment of the November 15th property tax installment. The FOIA responder noted that Freedom made the late payments and then listed the date that the City of Alexandria received the payment in the upper left hand corner of each tax

5

receipt. In every case, payments included penalties for late payment. In every case, the late payment of the property tax installment due in November 2017, due to IRS rules, could not be itemized as a deduction on each homeowner's 2017 Federal and state income tax.

26.     Both NYCB and Freedom have thus engaged in a pattern of failing to make required payments from escrow and have accumulated a significant portfolio of failed payments.

27.     Freedom has failed to make timely property tax payments in other jurisdictions as well. The Consumer Complaint Database, maintained on the official government website of the Consumer Financial Protection Agency ("CFPB"), provides a public record of complaints with consumers alleging that Freedom failed to make timely property tax payments. *See Consumer Complaint Database*, CFPB, https://www.consumerfinance.gov/data-research/consumer-complaints/ (last visited August 9, 2018).

28.     In just the first seven months of 2018, eleven CFPB complaints—identified by a unique "Complaint ID"—specifically allege that Freedom failed to make timely property tax payments out of escrow accounts. These complaints come from Alabama, Connecticut, Georgia, Missouri, Florida, Kentucky, New Hampshire, Wisconsin, North Carolina, and Maryland. *Id.* Expanding a search to include 2016 and 2017 increases the number to well over fifty complaints. *Id.*

## COUNT I
## VIOLATION OF THE REAL ESTATE SETTLEMENT
## PROCEDURES ACT OF 1974, 12 U.S.C. § 2601 et seq.

29.     Franceski realleges all the preceding allegations as if restated and set out here in full.

30.     Section 6 of the Real Estate Settlement Procedures Act of 1974 ("RESPA"), as amended, demands that the servicer of a federally related mortgage loan who receives loan

6

payments for deposit to an escrow account make timely payments of property taxes from that account as the taxes come due. 12 U.S.C. § 2605(g).

31.     Franceski's loan is a federally related mortgage loan within the meaning of 12 U.S.C. § 2602(1)(A), and her loan was made for a non-business purpose—the financing of her primary residence.

32.     On November 1, 2017—the date on which Franceski's payment was first due to Freedom—Freedom Mortgage became the "servicer" of Franceski's loan as defined by RESPA.

33.     Both NYCB and Freedom indicated to Franceski that Freedom would be the new servicer on November 1st, responsible for receiving loan payments and then taking those payments to make principal, interest, and tax payments.

34.     Franceski did actually make a payment to Freedom in November.

35.     Freedom Mortgage violated RESPA, 12 U.S.C. § 2605(g), by failing to make timely property tax payments out of the escrowed funds that it controlled.

36.     Freedom has shown a pattern or practice of failing to make payments out of escrow accounts for the timely payment of taxes as those payments have become due.

37.     RESPA makes violators of section 2605(g) liable to borrowers for any actual damages, as well as additional statutory damages if a pattern of noncompliance emerges. 12 U.S.C. § 2605(f). Costs and attorney's fees are also allowed. *Id*.

38.     Franceski has suffered actual damages in penalties and increased state and federal income tax liability.

39.     Franceski has suffered additional actual damages in the amount of time it took her to communicate with the City of Alexandria, NYCB, and Freedom in efforts to determine why

7

226764

her taxes were not paid and to demand Freedom pay the taxes and penalties before the City began a credit-damaging collections action.

40.     In the alternative, if NYCB is found by the court or trier of fact to be the servicer for Plaintiff and the putative class and sub class after November 1$^s$, for the specific purpose of having to make the second installment of the City of Alexandria property taxes, all of the paragraphs of Count I are also alleged against NYCB during any such time they were the RESPA servicer..

**COUNT II**
**BREACH OF CONTRACT**

41.     Franceski realleges and incorporates all the preceding allegations as if fully restated in this Count.

42.     Under Virginia law, the security instrument's agreement to maintain an escrow account and to remit Franceski's owed property taxes to the City of Alexandria constituted a contract between Franceski and NYCB.

43.     NYCB received, as valuable consideration, interest on the mortgage funds loaned and assurance that the property taxes and hazard insurance would be paid through the escrow account, reducing concerns about tax liens and insurance policy lapse.

44.     Franceski received, as valuable consideration, funds to finance the property at 975 Powhatan St., Alexandria VA 22314, and she also received the assurance that NYCB would ensure that taxes and insurance premiums would be paid in a timely manner.

45.     Freedom Mortgage assumed from NYCB obligations attached to the mortgage loan, including the servicing of the mortgage loan, when it purchased the loan from NYCB. Thus, Freedom had an obligation as transferee of the contract, and as servicer, to pay the property taxes in a timely manner out of the escrow account.

8

226764

46.     However, also under Virginia law, privity of contract remained between Franceski and NYCB after NYCB transferred the mortgage loan to Freedom. Thus, NYCB still had an obligation under contract to insure timely tax payments, and NYCB breached that obligation by failing to ensure that escrow funds were used to make timely payments of property taxes as they became due.

47.     Freedom and NYCB both breached their contractual obligations, causing foreseeable harm to Franceski in the form of penalties and increased income tax liability.

48.     Freedom and NYCB knew or should have known, due to widespread publicity regarding the tax law changes, that persons with mortgages in states with state income taxes would be highly likely to suffer irreversible harm should they fail to make timely property tax payments in 2017 due to the 2018 federal tax changes.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff realleges and incorporates all the foregoing allegations as if fully set forth again in this section of the Complaint.

50.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings a RESPA action for herself and on behalf of a class (the "Class"), defined as:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United Sates) who (a) had a residential mortgage loan obtained for primarily non-business purposes from any lender on real property within the United States or its territories or other political subdivisions; (b) had escrow agreements requiring Freedom or NYCB to remit property taxes to the applicable local jurisdictions from the property owner's escrow account; and (c) have not had their local property taxes paid pursuant to the referenced escrow agreements in a timely manner.

51.     Pursuant to Fed. R. Civ. P. 23, Plaintiff also brings a RESPA action for herself and on behalf of a subclass (the "Subclass"), defined as:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United Sates) who (a) had a residential mortgage loan obtained for primarily non-business purposes from any lender on real property within the United States or its territories or other political subdivisions; (b) had

9

escrow agreements requiring Freedom or NYCB to remit property taxes to the applicable local jurisdictions from the property owner's escrow account; and (c) lost their 2017 local property tax deduction on their federal and/or state tax returns due to Freedom's or NYCB's failure to pay his/her/their local property taxes in 2017.

52.     Specifically excluded from this Class and Subclass are

a.     All persons who elect to exclude themselves from this Class;

b.     All persons who have previously executed and delivered to Defendants a release of any claims that would otherwise be covered by the circumstances set forth in the definition of this Class above; and

c.     Defendants' officers, directors, agents, representatives, and their immediate family members.

53.     **Numerosity:** The Class is so numerous that joinder of all members is impracticable.

a.     At this time, Plaintiff does not know the exact size of the Class.

b.     Based on Freedom's own press release attached to the Complaint, it must have purchased at least hundreds of mortgages from NYCB.

c.     Based on the information described earlier in the Complaint, Plaintiff believes that Freedom or NYCB failed to make timely property tax payments for a significant number, if not all, of the mortgages that Freedom purchased from NYCB in 2017.

d.     Further, Freedom's failure to properly process property tax payments has likely affected mortgages that were not purchased from NYCB, and the number of affected property owners over the last three years will likely reach into the thousands given the aggregate value of VA loans that Freedom's press releases claim to service.

54.     **Commonality**: Common questions of law and fact exist as to all members of the Class.

a.     The primary focus of the litigation will be on whether Freedom or NYCB breached its statutory duty to remit Class members' property taxes to the applicable local

10

jurisdictions in a timely manner and whether Freedom or NYCB engaged in a pattern or practice of such behavior.

b.     A finding that either or both Defendants failed in their statutory duty to any of the Class members will likely be applicable to all or almost all Class members.

c.     A finding that either or both Defendants engaged in a pattern or practice of violating § 2605(g) will apply to every Class member.

55.    **Typicality:** Plaintiff's claims are typical of the other members of the Class.

a.     As discussed above as to the numerosity requirement, results of the City of Alexandria's FOIA request indicate that Freedom's and NYCB's failures in dealing with the loans transferred from NYCB to Freedom were systemic.

b.     Including Defendants' numerous other nationwide failures to make timely payments from required escrow accounts, as indicated by the substantial number of abovementioned complaints over the last three years, Freedom has shown a pattern of RESPA noncompliance with respect to all members of the Class.

c.     All members of the Class suffered the same as Plaintiff Franceski in that their property taxes were not timely and properly paid in accord with their escrow agreements, thus incurring late fees, and regardless of whether Freedom or NYCB ultimately paid to reimburse any Class members for any fees or other actual damages, all members of the Class are entitled to statutory damages as per RESPA.

d.     Damages suffered by each member of the Subclass may vary in that the tax consequences to each individual property owner will be different based on the individual's taxable income, filing status, other deductions, etc. Plaintiff alleges that these variations in this one aspect of damages can be resolved in the damages phase of litigation. Plaintiff further alleges that the issues on which Plaintiff's claims and damages are typical of other members of the Class predominate over any issues for which Plaintiff may have claims to damages that are not as typical of a great number of Class members.

226764

56.   **Adequacy:** Plaintiff will fairly and adequately protect the interests of the Class.

a.      Plaintiff's interests coincide with, and are not antagonistic to, other Class members' interests.

b.      Plaintiff has retained counsel experienced in complex, commercial, and large class action litigation.

54.   This matter may be maintained as a class action pursuant to Fed. R. Civ. P. 23(b)(3) in that questions of law and fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and effectively adjudicating the controversy

WHEREFORE, Plaintiff Barbara Franceski requests the following:

(a) That this Court certify the proposed Class.

(b) That this Court designate Plaintiff Franceski as Class representative.

(c) That this Court designate undersigned counsel as Class counsel.

(d) That this Court grant actual damages;

(e) That this Court grant statutory damages under 12 U.S.C. § 2605(f); and

(f) That this Court order other further reasonable relief including costs and attorneys' fees.

JURY TRIAL DEMANDED

Respectfully submitted,

/s/   Robert A. Fagella
Robert A. Fagella (018771977)
ZAZZALI, FAGELLA, NOWAK,
KLEINBAUM & FRIEDMAN
570 Broad Street Suite 1402
Newark, NJ 07102
(973) 623-1822
Fax: (973) 623-2209
rfagella@zazzali-law.com
*Counsel for Plaintiffs/Relator*

12

226764

John J. Beins (pro hac admission pending)
VA Bar #35435
Beins Goldberg LLP
2 Wisconsin Circle
\Suite 700
Chevy Chase, MD 20815
240.235.5040
jbeins@beinsgoldberg.com

Justin P. Keating (pro hac admission pending)
VA Bar #75880
Beins, Axelrod, P.C.
1717 K St., NW
Suite 1100
Washington, DC 20006
202.328.7222

Dated: September 17, 2018                     jkeating@beinsaxelrod.com

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, the undersigned attorney for Plaintiff Barbara Franceski hereby certifies that, to the best of his knowledge, the matter in controversy is not the subject of another action pending in any court or any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct. Executed on September 17, 2018.

Date: September 17, 2018           By:    /s/ Robert Fagella
                                          Robert Fagella, Esq.

13

226764

# EXHIBIT "A"

# NOTE
# (For Electronic Signature)

MIN: 100995500060621368

June 07, 2012

, [Date]

Aliquippa , PA

[City] , [State]

975 Powhatan Street
Alexandria , VA 22314

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $417,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is NVR Mortgage Company, LLC . I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 3.500% .

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month

I will make my monthly payment on the 1st day of each month beginning on August 01, 2012 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on July 01, 2042 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O Box 790376 , St. Louis , MO 631790376 or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,872.52 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

Non Authoritative Copy

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of <u>Fifteen</u> calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be <u>5.000%</u> of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 11. ISSUANCE OF TRANSFERABLE RECORD; IDENTIFICATION OF NOTE HOLDER; CONVERSION FROM ELECTRONIC NOTE TO PAPER-BASED NOTE

(A) I expressly state that I have signed this electronically created Note (the "Electronic Note") using an Electronic Signature. By doing this, I am indicating that I agree to the terms of this Electronic Note. I also agree that this Electronic Note may be Authenticated, Stored and Transmitted by Electronic Means (as defined in Section 11(F)), and will be valid for all legal purposes, as set forth in the Uniform Electronic Transactions Act, as enacted in the jurisdiction where the Property is located ("UETA"), the Electronic Signatures in Global and National Commerce Act ("E-SIGN"), or both, as applicable. In addition, I agree that this Electronic Note will be an effective, enforceable and valid Transferable Record (as defined in Section 11(F)) and may be created, authenticated, stored, transmitted and transferred in a manner consistent with and permitted by the Transferable Records sections of UETA or ESIGN.

(B) Except as indicated in Sections 11 (D) and (E) below, the identity of the Note Holder and any person to whom this Electronic Note is later transferred will be recorded in a registry maintained by MERSCORP Holdings, Inc., a Delaware Corporation or in another registry to which the records are later transferred (the "Note Holder Registry"). The authoritative copy of this Electronic Note will be the copy identified by the Note Holder after loan closing but prior to registration in the Note Holder Registry. If this Electronic Note has been registered in the Note Holder Registry, then the authoritative copy will be the copy identified by the Note Holder of record in the Note Holder Registry or the Loan Servicer (as defined in the Security Instrument) acting at the direction of the Note Holder, as the authoritative copy. The current identity of the Note Holder and the location of the authoritative copy, as reflected in the Note Holder Registry, will be available from the Note Holder or Loan Servicer, as applicable. The only copy of this Electronic Note that is the authoritative copy is the copy that is within the control of the person identified as the Note Holder in the Note Holder Registry (or that person's designee). No other copy of this Electronic Note may be the authoritative copy.

(C) If Section 11 (B) fails to identify a Note Holder Registry, the Note Holder (which includes any person to whom this Electronic Note is later transferred) will be established by, and identified in accordance with, the systems and processes of the electronic storage system on which this Electronic Note is stored.

(D) I expressly agree that the Note Holder and any person to whom this Electronic Note is later transferred shall have the right to convert this Electronic Note at any time into a paper-based Note (the "Paper-Based Note"). In the event this Electronic Note is converted into a Paper-Based Note, I further expressly agree that: (i) the Paper-Based Note will be an effective, enforceable and valid negotiable instrument governed by the applicable provisions of the Uniform Commercial Code in effect in the jurisdiction where the Property is located; (ii) my signing of this Electronic Note will be deemed issuance and delivery of the Paper-Based Note; (iii) I intend that the printing of the representation of my Electronic Signature upon the Paper-Based Note from the system in which the Electronic Note is stored will be my original signature on the Paper-Based Note and will serve to indicate my present intention to authenticate the Paper-Based Note; (iv) the Paper-Based Note will be a valid original writing for all legal purposes, and (v) upon conversion to a Paper-Based Note, my obligations in the Electronic Note shall automatically transfer to and be contained in the Paper-Based Note, and I intend to be bound by such obligations.

(E) Any conversion of this Electronic Note to a Paper-Based Note will be made using processes and methods that ensure that (i) the information and signatures on the face of the Paper-Based Note are a complete and accurate reproduction of those reflected on the face of this Electronic Note (whether originally handwritten or manifested in other symbolic form); (ii) the Note Holder of this Electronic Note at the time of such conversion has maintained control and possession of the Paper-Based Note; (iii) this Electronic Note can no longer be transferred to a new Note Holder; and (iv) the Note Holder Registry (as defined above), or any system or process identified in Section 11 (C) above, shows that this Electronic Note has been converted to a Paper-Based Note, and delivered to the then-current Note Holder.

(F) The following terms and phrases are defined as follows: (i) "Authenticated, Stored and Transmitted by Electronic Means" means that this Electronic Note will be identified as the Note that I signed, saved, and sent using electrical, digital, wireless, or similar technology; (ii) "Electronic Record" means a record created, generated, sent, communicated, received, or stored by electronic means; (iii) "Electronic Signature" means an electronic symbol or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign a record; (iv) "Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form; and (v) "Transferable Record" means an electronic record that: (a) would be a note under Article 3 of the Uniform Commercial Code if the electronic record were in writing and (b) I, as the issuer, have agreed is a Transferable Record.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED /

*Electronically signed by Barbara Franceski on 6/7/2012 11:32:38 AM ET*

*[Sign Original Only]*

Virginia Fixed Rate Note - Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3247e 5/05

Non-Authoritative Copy

# EXHIBIT "B"

Parcel Identification No.:
After recording please return to:           Prepared by:
NYCB Mortgage Company, LLC Final Documents    NYCB Mortgage Company, LLC
Department
[Name]                                      [Company Name]

[Attention]                                 [Name of Natural Person]
1801 East 9th Street, Mail Code OH99-0401    1801 East Ninth Street Suite 200
[Street Address]                            [Street Address]
Cleveland, Ohio  44114-3516                 Cleveland, OH  44114
[City, State  Zip Code]                     [City, State  Zip Code]

—————————————————[Space Above This Line For Recording Data]—————————————

Loan Number: 6062136
MIN: 100995500060621368

# DEED OF TRUST

The following information, as further defined below, is provided in accordance with Virginia law:  This Deed of Trust is given by **BARBARA FRANCESKI** as Borrower (trustor), to **SERVICELINK**, as Trustee, for the benefit of **"MERS"** is **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns, as beneficiary.

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)      **"Security Instrument"** means this document, which is dated **June 7, 2012**, together with all Riders to this document.

(B)      **"Borrower"** is Barbara Franceski. Borrower is the trustor under this Security Instrument.

(C)      **"Lender"** is NYCB MORTGAGE COMPANY, LLC.  Lender is a Banking Corporation organized and existing under the laws of State of New York.  Lender's address is 1801 East Ninth Street Suite 200, Cleveland, OH 44114.

(D)      **"Trustee"** is ServiceLink.  Trustee (whether one or more persons) is a Virginia resident and/or a United States or Virginia chartered corporation whose principal office is located in Virginia.  Trustee's address is 250 Commerce St. 2nd Floor, Irvine, CA 92602.

(E)      **"MERS"** is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.

**"Note"** means the promissory note signed by Borrower and dated June 7, 2012.  The Note states that Borrower owes Lender  Four Hundred Seventeen Thousand  and 00/100ths Dollars (U.S. $417,000.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than July 1,

Virginia Deed of Trust—Single Family—Fannie Mae/Freddie Mac Uniform Instrument          MERS Modified Form 3047 1/01
The Compliance Source, Inc.                                    Page 1 of 13      Modified by Compliance Source 14301VA 08/00 Rev. 04/08
www.compliancesource.com                                                        ©2000-2008, The Compliance Source, Inc.
                                                                                                            6062136

2042 .The interest rate stated in the Note is **3.500%**.  If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in accordance with the attached Adjustable Rate Rider.

(G)     "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)     "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)     "**Riders**" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☐ Other(s) [specify] | | |

(J)     "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)     "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)     "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)     "**Escrow Items**" means those items that are described in Section 3.

(N)     "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)     "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)     "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)     "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)     **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | Alexandria |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

See Attached Exhibit A

which currently has the address of 975 Powhatan Street
                [Street]

Alexandria / Alexandria      , Virginia 22314                      ("Property Address"):
     [City/County]                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.

Virginia Deed of Trust—Single Family—Fannie Mae/Freddie Mac Uniform Instrument                    MERS Modified Form 3047 1/01
The Compliance Source, Inc.                    Page 3 of 13    Modified by Compliance Source 14301VA 08/00 Rev. 04/08
www.compliancesource.com                                            ©2000-2008, The Compliance Source, Inc.
                                                                                          6062136

Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   **2.    Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   **3.    Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts

Virginia Deed of Trust—Single Family—Fannie Mae/Freddie Mac Uniform Instrument          MERS Modified Form 3047 1/01
The Compliance Source, Inc.          Page 5 of 13     Modified by Compliance Source 14301VA 08/00 Rev. 04/08
www.compliancesource.com          ©2000-2008, The Compliance Source, Inc.
6062136

disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has − if any − with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party," means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's

acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more

of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

     **20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

     Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

     **21.  Hazardous Substances.**  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

     Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

     Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a' default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

Virginia Deed of Trust—Single Family—Fannie Mae/Freddie Mac Uniform Instrument
The Compliance Source, Inc.
www.compliancesource.com
Page 12 of 13
MERS Modified Form 3047 1/01
Modified by Compliance Source 14301VA 08/00 Rev. 04/08
©2000-2008, The Compliance Source, Inc.
6062136

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)                    _____ (Seal)
Barbara Franceski                 -Borrower                                          -Borrower
                          [Printed Name]                                    [Printed Name]

_____ (Seal)                    _____ (Seal)
                          -Borrower                                          -Borrower
                          [Printed Name]                                    [Printed Name]

## ACKNOWLEDGMENT

State of                                        §
                                                §
County of                                       §

The foregoing instrument was acknowledged before me on                            by Barbara Franceski.

_____
Signature of Person Taking Acknowledgment

_____
Printed Name

_____
Title or Rank

Serial Number, if any:

(Seal)                        My Commission Expires:

# EXHIBIT "C"

0252-XXXXXX2136-10092017

**New York Community Bank**
Member FDIC

October 9, 2017

Loan: XXXXXX2136

Property Address
975 POWHATAN STREET
ALEXANDRIA VA 22314

*********ALL FOR AADC 220
00021132    1 AB  0.403          80 80  21132
BARBARA FRANCESKI
975 POWHATAN STREET
ALEXANDRIA VA 22314

*[handwritten]* 11/20/17
6:45pm
- created
online
account

Current Loan Number: 0006062136
New Servicer's Loan Number: ●●●●●0075

### NOTICE OF SERVICING TRANSFER

Dear Barbara  Franceski,

The servicing of your mortgage loan is being transferred, effective October 31, 2017. This means that after this date, a new servicer will be collecting your mortgage loan payments from you.  Nothing else about your mortgage loan will change.

New York Community Bank is now collecting your payments.  New York Community Bank will stop accepting payments received from you after October 31, 2017.

FREEDOM MORTGAGE will collect your payments going forward.  Your new servicer will start accepting payments received from you on November 1, 2017. *(in system by Nov. 7)*  *can do one time payments each*

Send all payments due on or after November 1, 2017 to FREEDOM MORTGAGE at this address: *month*
P.O. BOX 89486, CLEVELAND, OH 44101-9486.  *simple rep 10/23/17 4:05pm*

Automatic drafting of payments will be discontinued effective with this servicing transfer.  If your monthly mortgage payment is currently being automatically withdrawn from your bank account on either a monthly or bi-weekly schedule, contact FREEDOM MORTGAGE to determine if they offer similar programs.

If you have any questions for either your present servicer, New York Community Bank or your new servicer, FREEDOM MORTGAGE, about your mortgage loan or this transfer, please contact them using the information below:

Current Servicer:
New York Community Bank
Customer Contact Center
(888) 696-4444
1801 East 9th Street
Cleveland, OH 44114
Monday through Friday:
8:00 A.M. - 8:00 P.M. ET
and Saturday: 9:00 A.M. - 5:00 P.M. ET

*877-786-6560*

New Servicer:
FREEDOM MORTGAGE
CUSTOMER SERVICE
855-690-5900
P.O. BOX 50428
INDIANAPOLIS, IN 46250-0401
Monday through Friday: 8:00 A.M.-10:00 P.M. ET
and Saturday: 9:00 A.M. to 6:00 P.M. ET

1801 East Ninth Street ● Suite 200 ● Cleveland ● Ohio 44114



# EXHIBIT "D"



Return Mail Service Only
PLEASE DO NOT SEND
PAYMENTS TO THIS ADDRESS
P.O. Box 619063
Dallas, TX 75261-9063

# Welcome!



5-807-14397-0072923-015-1-100-100-000-000
BARBARA FRANCESKI
975 POWHATAN ST
ALEXANDRIA VA  22314-1360

November 08, 2017                                                    RE: Your Freedom Mortgage Loan # 0058270075

Dear BARBARA FRANCESKI,

## Welcome to Freedom Mortgage!

The servicing of your mortgage loan from NEW YORK COMMUNITY BANK has transferred to us, effective 11/01/17. Your term, rate, and balance are unchanged from your original loan, but we'll be collecting your payments from now on.

Below are a few important details to get you started.

## Contact & Payment Information



Your mortgage information is available 24/7 at **freedommortgage.com** after you complete a quick and easy registration process.

Your online account puts your loan information at your fingertips so you can make a payment, set up auto-pay, or **update your contact information** when it's convenient for you.  An important part of your profile is your email address, which we'll use to keep you informed. Go to **freedommortgage.com** for more details.



Starting 11/01/17, please make checks payable to Freedom Mortgage Corporation (include your loan number 0058270075) and send to:
        Freedom Mortgage Corporation
        PO Box 89486
        Cleveland, OH 44101-9486



If you have auto-pay with NEW YORK COMMUNITY BANK , it will be discontinued. Setting up new auto-pay with Freedom Mortgage is easy and minimizes late or missed payments in the future.

        - Create your user account online at **freedommortgage.com.**



For additional questions, Customer Care professionals are available to help you at **855-690-5900,** Monday through Friday from 8:00am to 10:00pm ET and Saturday from 9:00am to 6:00 pm ET.

Providing you with exceptional customer service is our number one goal. For over 25 years, we've established ourselves as a market leader and rank amongst the nation's top mortgage providers. We look forward to helping you now and in the future. We're glad you're here.

Sincerely,

Joel Davis
Senior Vice President, Residential Servicing, Freedom Mortgage Corporation

        **(Please see the reverse side for additional information regarding the transfer of your loan)**





## Terms

The transfer of the servicing of your mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

## Your Prior Servicer

Your prior servicer is NEW YORK COMMUNITY BANK. If you have any questions regarding this transfer of servicing, NEW YORK COMMUNITY BANK's Customer Service department can be reached at 888-696-4444 or 1801 EAST 9TH STREET, CLEVELAND OH 44114.

## Additional Information Concerning Your Payments

The date that NEW YORK COMMUNITY BANK will stop accepting payments from you is 10/31/17. The date that Freedom Mortgage will start accepting payments from you is 11/01/17.

## New Billing Statement

If a payment is due before you receive your new Freedom Mortgage billing statement, please send your payment to Freedom at the address listed on the reverse page. Be sure to include your loan number 0058270075 on the check. The exact amount of your monthly payment is as follows:

> Principal and Interest (P&I): $1,872.52
> Escrow: $964.79
> Total Monthly Payment: $2,837.31

## Payment Grace Period

Under Federal law, during the 60-day period following the effective date of the transfer of the loan servicing 11/01/17, a loan payment received by NEW YORK COMMUNITY BANK on or before its due date may not be treated by Freedom Mortgage as late, and a late fee may not be imposed.

## Payment Methods

When you pay your bill by check, you authorize us to electronically process your payment. If your check is processed electronically, your checking account may be debited the same date we receive the check and it will not be returned with your checking account statement. If someone other than you or a bill paying service pays your bill, you must notify them of this policy.

| SERVICE | DESCRIPTION | FEES |
|---|---|---|
| Pay by Phone (Representative) | This fee is charged to make a payment by phone with a representative. | Up to $15.00 |
| Pay by Phone (Automated) | This fee is charged to make a payment through an automated phone system. | Up to $10.00 |
| Pay by Web | This fee is charged to make a payment online. | No Charge |
| Payoff Statement | This fee is charged when requesting a payoff statement. Shows remaining principal balance, accrued interest, and the interest rate. | Up to $30.00 |
| NSF/Returned check | This fee is charged when the account holder's bank doesn't honor a check. | Up to $40.00 |
| Assumption Fee | This fee is charged to process an application for a new borrower to assume the loan obligation. | Up to $900.00 |

Rev. 10/02/2017





## Additional Insurance

The transfer of servicing rights may affect the terms, or the continued availability of, mortgage life, disability, accidental death or any other type of optional insurance in the following manner:

-- These products and services will not be transferred to Freedom Mortgage. Contact your carrier to learn about your options to continue coverage directly through them.

## Notice of Error or Request for Information

To submit a written Notice of Error or Request for Information please include your full name, your loan number, and the error you believe to have occurred or the Information you are requesting about your mortgage account. Within five (5) days (excluding legal public holidays, Saturdays and Sundays) of receiving your request, a written acknowledgment will be provided to you. Freedom Mortgage will respond no later than 30 days after receiving the initial written request.

> Please send written notices of error/requests for information to:
> Freedom Mortgage Corporation
> PO Box 50428
> Indianapolis, IN 46250-0401